And the next case is Jennifer Sutton v. Royal Caribbean Cruises. And Mr. Lima should be here for the appellate. Mr. Jarnagan for the appellee. Mr. Lima, you may begin when you're ready. May it please the court. Good morning. My name is Paulo Lima. I'm here on behalf of the appellant, Jennifer Sutton. Your honors, we're here on the district court's grant motion for summary judgment. I won't get into too much of the background. As you know, the district court granted Royal Caribbean's motion on two separate grounds. Number one, that Royal Caribbean lacked notice of the dangerous condition. And number two, that irrespective of notice, that the plaintiff was not entitled to avail herself of the doctrine of res ipsa locatur. It's important to note that either one of these two errors provides an independent grounds for reversing the summary judgment and remanding for further proceedings. On the lack of notice issue, the primary defect is that the district court focused solely and exclusively on the lack of any prior similar incidents involving the dangerous condition. And so that really wasn't an issue below as frankly, the plaintiff never took the position that there were any prior similar incidents. Well, there was a little more than that, wasn't there? The district court also said that the expert, the plaintiff's expert is merely speculating that the maintenance and the inspection was not enough. And also, the district court focused on the fact that the record reflects that Royal Caribbean employees inspected, cleaned, and maintained the machine, right? Your honor, I don't recall seeing anything in the district court's summary judgment order referring to the plaintiff's expert, Mr. Lyle at all. The focus was the sum total of its analysis is about a paragraph on pages four and five of docket entry 47 is the district court's order. And it just states that plaintiff has not come forward with any evidence that falling lighting or equipment, whether . . . Dr. Lyle is speculating about the maintenance and inspection and whether or not it was enough to detect a problem with this machine. And they also say in their brief that it's clear from this record that Royal Caribbean inspected, cleaned, and maintained the machine. In this case, it's just like the Seventh Circuit's decision in Monteleone versus Bahama cruise lines. Your honor, reading from their brief or from the district court order? In their brief. This is from their brief. Yes, your honor. That was certainly their position is that they inspected the machine. However, as we explained in our brief, as Mr. Lyle put forth in his affidavit, the quote unquote inspection and maintenance amounted to blowing off the mirrors and the lights with compressed air. In fact, we cited to the corporate representative, Ms. Amanda Campos. That's document entry 35-2. And she said, you know, they clean all the dust off. They look at the machine and that's it. They don't touch it. Where's the evidence of constructive notice? All you have is Dr. Lyle's expert opinion, right? Is there anything other than that? The maintenance . . . well, Dr. . . . yes, Dr. Lyle's opinion coupled with Ms. Campos testimony and the maintenance records, which confirm exactly what Mr. Lyle says in his expert report. How do the maintenance records give them notice? No, your honor. I apologize if I've misunderstood. The maintenance records support Dr. . . . Mr. Lyle's position that whatever inspection or maintenance that they claim to have performed was grossly inaccurate, inadequate. What did you want them to do? I'm not . . . I'm not certain. Like what did they have notice of that they should do? So Mr. Lyle states in his affidavit that the standard of care would have called for, quote, examining all connections, securing equipment, especially all moving parts, and integrity of the screws or bolts. And here lies . . . Did he read the user manual? I mean, at page 21, it says once it's installed, don't touch, basically. We disagree with that, your honor. Mr. Lyle's report actually says that with respect to installing the mirror, it shouldn't require any additional sort of adjustments to the mirror. However, there's a statement in there that says for maintenance instructions, contact your Martin representative. Martin would be the manufacturer. So did you call someone from Martin who said they should . . . we instructed them, they should always check the screws? We did not, your honor. However, we would submit that that's not what's required. Mr. Lyle gave testimony which was unrebutted in the record. Royal Caribbean never introduced any sort of expert or lay testimony for that matter with respect to the adequacy of their maintenance. What would have put them on notice? Back to Judge Wilson's question. I'm still not sure. So the fact is that the Martin MX-10 is a heavy machine that's rotating over the heads of club goers in the Labyrinth Nightclub. It is . . . The machine didn't fall. The machine's 50 pounds. Correct. And so what would have given them notice to inspect a small part of the machine? The fact that this machine is constantly moving and pursuant to, again, the industry standards which are cited in Mr. Lyle's report, when you have that sort of equipment, there's an expectation that it's going to . . . I'm sorry to interrupt you. I thought Mr. Lyle in his report cited the industry standard for sound equipment. Am I wrong? For sound and lighting equipment. It's ANSI followed by some long number. And that goes directly to the qualifications of Mr. Lyle. Mr. Lyle served as the technical director on Norwegian Cruise Line, not the defendant in this case, but a different cruise line, doing exactly this type of work in supervising the lighting and sound equipment. He's got extensive experience with all sorts of stage publications, productions rather. He is an assistant professor at Florida State University. So if there were ever an expert on this sort of . . . The government was never determined. They accepted that. But what is still back to the question, I'm still not following what put them on notice. The notice is that when you have a machine of this sort, that's in constant motion above the heads of people, it presents a danger that because of the fact of the way that it operates, it's going to slowly . . . These screws and bolts that hold the mirror and other pieces of the machine in place are going to become loose. And at the very least, it requires some sort of inspection. They admit that they have to . . . That they dusted it. They cleaned it. They clearly went up and took a look at it and kept it clean. He said what he said is that the bolts more likely than not became loose slowly over time, rather than through a sudden break or failure. And that sounds like pure speculation to me. I would disagree, Your Honor, because he's basing this on, again, his 28 years' experience of assembling more than 300 productions across the country, working for cruise lines, doing this sort of work. And so he . . . Again, we're at the summary judgment stage here. All inferences need to be construed in the favor of the plaintiff. And again, not only did Royal Caribbean fail to put forth any expert testimony on this topic . . . And we don't have to make any inference from conjecture. We don't rely on conjecture or speculation. I would say that it's not speculation. It's an expert opinion that has been . . . that he's reached by reviewing the materials in the case. Again . . . He didn't even review the equipment, right? And that's a great point, Your Honor, because the reason he was unable to review the equipment is because Royal Caribbean destroyed it or discarded it. If you look at Ms. Campos's deposition, we've cited in our brief, she said that . . . She was asked what happened to it. She says, well, I don't know. I went. I asked. It was discarded. We don't know what happened to it. So for Royal Caribbean to now stand up . . . Any evidence of bad faith? Well, we don't get into that, Your Honor, because frankly, spoliation was not raised below, and that's not an issue here. But I just point out that it's sort of disingenuous for them to . . . But in any event . . . . . . make issue. If you were to prevail on summary judgment, you still wouldn't get an adverse inference instruction in the absence of bad faith. Evidence of bad faith, right? Correct. Correct. And that's not what we're seeking here. We're just seeking for a reversal of summary judgment on the notice issue. And as my time is getting a little short, I'd like to proceed to the Res Impsa inference issue because, again, that provides an independent basis, regardless of what this court finds with respect to the notice, that if there have been several district courts in this circuit that have held in three published opinions that if you are entitled to a Res Impsa inference, then notice is irrelevant and there is no need to show notice. Is there a possibility that there may have been a design defect? That was an interesting finding by the district court. We would submit that there is, as we've said in our brief, no evidence of the design defect. Don't you have the burden? You have to show that other causes, at least you have to put forward some evidence that other causes couldn't cause it. The Supreme Court has held in Johnson that no, let me find the correct language here, no act need be explicable only in terms of negligence in order for the rule of Res Impsa locator to be invoked. And under the, in the second circuit. You have the burden, right? We do have the burden of showing that we are entitled to a Res Impsa inference. That's absolutely correct, Your Honor. And so you have to come forward with some evidence that the injury would not occur in the ordinary course of things unless there was negligence, correct? I'm saying that correct? Correct. Correct. And what we've submitted is that number one, we've met that burden through the affidavit of Mr. Lyle, which says, and I think it's frankly rather self-evident. I don't know that you even need an expert affidavit that this is the type of incident which would not occur, but for the failure of regularly and properly inspect. Why, why couldn't it occur because of a product defect? Well, they, they improperly installed the mirror on this product. I mean, it seems perfectly reasonable to me if a part of a product, not the entirety of the product, a small part of the product causes the injury that could be related to a product defect. Two responses to that, Your Honor. Number one, the defendant expressly disavowed that in docket entry 39. It's their reply in support of motions for summary judgment. At page six, they say plaintiff has not presented any evidence showing how the MX-10 machine here was defective. That's number one. Number two, wait, they just said you, they're saying the same thing I just said, which is you haven't shown any, you put forward any evidence to disabuse the court of that notion so we can't accept the doctrine. Of a design defect. No, I'm sorry, of a design defect. They're the ones who, or the district judge is the one who put forth the notion that, well, there are other potential alternative causes, one of them being a design defect. The district court has to rule whether race HPSA applies. So the district court looks at it and says, there's no, no one has ruled out these other causes. In order for it to apply, you have to have some evidence from which these other causes could be ruled out. Otherwise, this doesn't get to the jury. Well, I would take issue with it being our burden to affirmatively rule out every other conceivable cause. What we have to do is. Sorry, I'm, if you're interpreting my question that way, you have to put forward evidence under the doctrine from which a jury could rule out the other causes because it's your burden and it's, it's, there's none of that evidence in the record. It is your honor, but we cannot rule out every other conceivable cause. As we've said in our reply brief, there's all sorts of potential possibilities. We have to rule out probabilities and for it to be a reasonable probability. Let me just clarify. Do you agree with the district court statement of what the test is for race HPSA that you have to rule out other equally probable alternate alternative causes? I would agree with equally probable. And that's where the design defect does comes in. If there were a design defect, we would see other incidents of the MX 10 machine dropping mirrors on passengers. And as the district court made a very big deal out of in the notice portion of its discussion, there were no such prior incidents. So that badly undermines that element of the analysis. I see my time is up. Probability that the screws on the mirror loosened undetectably over time. And your honor, that's again, the only evidence of that. We do agree. And Mr. Lyle's affidavit expressly states, yes, they did loosen over time. The problem with that is the word undetectably. The only evidence that we actually have in the record is from Mr. Lyle, where he says they loosened undetectably. There is no expert evidence from the defense, no evidence of any sort saying, oh, no, that it was undetectable. And that's why we think the district court erred in finding that a reasonable alternative inference. I see I'm into my rebuttal time. I'll reserve the remainder for rebuttal. Thank you, Mr. Lima. We'll hear from Mr. Jarnigan. Good morning. May it please the court. My name is Cooper Jarnigan, and I'm here today with Richard McAlpin. We represent Royal Caribbean Cruises Limited. And we're here today asking that this court affirm the district court's order granting summary judgment in favor of Royal Caribbean. What this case comes down to is plaintiff has only offered their proffered expert, James Lyle's opinions as evidence of notice and res ipsa loquitur in this case. There was no evidence in the record regarding any accident reports, passenger comments, reviews or forms, maintenance logs, or any other documents that would put Royal Caribbean on notice of the alleged risk-creating condition of the mirror falling from the MX-10 machine. Not only that, Royal's corporate representative also affirmatively testified that Royal Caribbean has never experienced any issues with these MX-10 lighting machines. Of course, the court would have been in a better position to make a more informed decision if we had the MX-10 machine. What happened to the MX-10 machine? Yes, Your Honor. The MX-10 machine was discarded. I'm not sure what happened to it after the incident. But the rotating mirror was preserved. And that's something that Mr. Lyle did not look at as part of his opinions. So what we did preserve, Mr. Lyle actually never even looked at. And also, he could have looked at an exemplar MX-10 machine or something like it. But that did not happen in this case. And also, the plaintiff did not move for any type of spoliation, sanction in the lower court either. It seemed like if there was a claim, a company like Royal Caribbean, which is subject, I would imagine, to a lot of litigation of this nature, would preserve the evidence so that the evidence could be inspected by the plaintiff's expert. Yes, Your Honor. Well, in this case, only part was preserved. And that was the part that actually fell and struck her. So that part was preserved. But like I said, Mr. Lyle did not even take the opportunity to look at that piece of evidence. So what we have here is Mr. Lyle's only speculating that the screws slowly came loose. And this was the cause of the injury. Again, Mr. Lyle did not inspect the ship. He did not expect an exemplar MX-10 machine. He admits... I'm going to let the race hipster go to the jury since he puts forward evidence through his expert that it's more likely than not caused by the negligence of the company. And there's no evidence that anything else caused this. And you didn't even have an expert, right? That's correct. But we did bring forth affirmative evidence that Royal Caribbean employed sound and light technicians that are specialized in rigging. And they do go up on the ladders. They visually inspect the machines. They blow out the dust. Royal Caribbean also stated that their policy, if they see something wrong with the lighting machines, they log it in an AVO log, which is avoid verbal order. So had something been wrong with it, then they would have logged it. And that would be available to plaintiffs. However... Right, it shouldn't go to the jury because we've actually brought forth affirmative evidence saying... ruling out other alternative causes. So we said there could have been a manufacturing defect. There could have been a design defect. And those are causes that they did not rule out. That's not the standard, though, is it? It could have been, or it's possible. The standard is there have to be probable alternative causes that exclude negligence on the part of Royal Caribbean. That's a whole different territory there. There's a big difference between possible and probable, isn't there? There is a difference, but in this case, there is affirmative evidence of Royal Caribbean's maintenance and inspections of the machine. And also the fact that there are no prior issues with the MXM machines would lean towards an inference saying, OK, well, more likely than not, this was a design defect or a sudden break or failure. So on that issue, it should not go to the jury. And this was a bench trial, so Judge King was also making that determination. So going back to the constructive notice issue, plaintiff had an obligation to show specific facts demonstrating that there is a purported defect with the machine and also that there is sufficient time to allow Royal Caribbean to correct it. And again, Mr. Lyle's opinions, there's nothing specific. There's nothing tangible there. It's all speculation. It's all conjecture. And we don't necessarily need to dig into his opinions because there's actually nothing affirmatively saying what the defect was, when the defect developed, when it became a dangerous condition, and whether Royal Caribbean has sufficient time to fix that dangerous condition. And a similar case is Adams v. Carnival, where Judge Seitz said that was also a collapsing chair case. And she said, to be sure the record contains no evidence to show Carnival actually knew of a defect in the chair. Further, assuming a defect existed, there's no evidence showing that existed over a period of time to allow for corrective action. And she went on to consider Monte Leon. And she said, we simply cannot conclude that Carnival's failure to discover the defective condition, assuming as we do that it existed prior, constituted a lack of care for which it can be liable. So here, we are not sure what the defect is. We're not sure what caused the mirror to fall. Mr. Lyle's opinions don't really shed light on that. It's more probably than not, even though he didn't look at the machine. He didn't look at an exemplar machine. He didn't go on the ship. He doesn't know about the environment of the ship. And furthermore, going back to the race up to Loquiter point about bringing forth affirmative evidence, we also have the manual that Royal Caribbean used that said that with regards to service, that there is no need for an adjustment of the mirror after installation. And we also, and there's also no specified frequency or comprehensiveness that we need to go by. It says, set it up with your service technician. And as the panel pointed out in this case, plaintiff did not contact any service technician or anyone from Martin. And that was their burden to come forward to try and help prove the notice issues of their case and the race up to Loquiter issues also. What about their argument that the fact that it's never happened before shows it's not a product defect? The plaintiff's argument? Yes. The fact that it's never happened before shows that it's not defect. Well, I feel it would go the other way because if it's never happened before, their expert is saying that the screws slowly loosened over time. And so we cite a case law saying, well, that doesn't meet the third element of the race up to Loquiter test. That's not something that ordinarily occurs in the absence of negligence. So we cite to a few cases. Basically, they're similar. They're collapsing chair cases. And again, they involve screws and brackets. And in those cases again, which also entails some constructive notice language as well. In those cases, the court discusses that when looking at the race up to issue, that it did not apply in these screws and brackets situations because for reasons that mechanical devices can sometimes get out of working order and become dangerous without negligence on the part of anyone at all. So these aren't the type of incidents that would ordinarily occur due to Royal Caribbean's negligence in this case. And specifically in Ballard that we cite in the brief, they state, although the devices that failed here the screws and brackets holding the handrail to the wall or to the wall itself after the plaintiff had ripped out the handrail are by no means as complicated as an escalator. They too can cease fulfilling their intended function and create a dangerous condition without someone's negligence. So there's multiple cases in the brief that talk about how this type of incident is not one that occurs ordinarily in the absence of negligence. And also stand for the proposition that neither common sense nor anything compels that only poor maintenance or careless inspection is going to lead to a chair's breaking. And so here their own expert is saying, well, it was screws that loosened slowly over time. So while they use that for the notice argument, it cuts against the reciprocity argument because of the case law stating that these are the types of incidents that reciprocity did not apply to. Because there's equally, there's other factors and probable causes other than Royal Caribbean's negligence. So again, looking at what Royal Caribbean brought to the table, they brought the maintenance logs that don't dictate any issues. They have the deposition testimony of Amanda Campos saying they never had issues in the past, that they affirmatively go up and they clean and they inspect and they maintain the machines according to the manual. That is in the record. And for all these reasons, unless the court has any other questions, I'll yield my time. Thank you, Mr. Jarnagan. We'll hear again from Mr. Lima. Thank you, your honors. On the notice point, I keep hearing it's speculation. It's speculation. The mechanism for them to get rid of Mr. Lyle's opinions or to counter it was the Daubert motion. And for them to sort of backdoor, exclude Mr. Lyle's opinion through the summary judgment order, I think is just improper. And getting to the merits of that, Mr. Lyle, this has been his life's work. This is not some expert who has no experience in the field. He's worked with these sort of machines for decades. He reviewed a video of the machine in action. He reviewed a lot of the materials in this case, the plaintiff's deposition. He had an adequate basis. Not that that's necessarily before the court, but it's important to note that the speculation theme is not well-founded. As to the race ipsa issue, it's very important to note the burden again is to exclude any equally probable scenarios, not to go out and knock down any potential conceivable other cause. And a good case to illustrate that, I mean, there's two, we've cited the Manhattan by sale case out of the second circuit in 2017, but more persuasive is the United States versus Baycon Industries case from this circuit in 1986. And that case involved a dredge that was being dragged through Tampa Bay on a calm, windless night. The dredge began taking on water and sunk without any potential, without any explainable cause. And so the government sought a race ipsa application of the race ipsa doctrine. The trial court granted it and this court affirmed, and essentially in the reasonable competing inferences analysis, it stated that, there were certainly other potential causes of a dredge sinking, but it noted that weather was not a factor. Rough water was not involved. There was no testimony concerning any abnormal incident, which have indicated any damage from a sunken obstacle or floating debris. And so the point of that case is essentially you only need to address any competing inferences to the extent that there's any actual evidence of them, not to knock down other potential explanations of which there is no evidence. So again, I would just ask that the court reverse and remand with instructions that on a new trial that the race ipsa locator inference be granted. Thank you, counsel. Thank you, your honors. Court is adjourned.